We will hear argument this morning in Case 23-726, Moyle v. United States, and the consolidated case. Mr. Turner. Thank you, Mr. Chief Justice, and may it please the Court. When Congress amended the Medicare Act in 1986, it put EMTALA on a centuries-old foundation of state law. States have always been responsible for licensing doctors and setting the scope of their professional practice. Indeed, EMTALA works precisely because states regulate the practice of medicine. And nothing in EMTALA requires doctors to ignore the scope of their license and offer medical treatments that violate state law. Three statutory provisions make this clear. First, Section 1395, the Medicare Act's opening provision, forbids the federal government from controlling the practice of medicine. That's the rule of state regulation. Second, Subdivision F in EMTALA codifies a statutory presumption against preemption of state medical regulations. And third, EMTALA's stabilization provision is limited to available treatments, which depends on the scope of the hospital staff's medical license. Illegal treatments are not available treatments. Add in this Court's own presumption against preemption of state regulations, combine that with the need for clear and unambiguous spending clause conditions, and the administration's reading becomes wholly untenable. The administration's misreading also lacks any limiting principle. If ER doctors can perform whatever treatment they determine is appropriate, then doctors can ignore not only state abortion laws but also state regulations on opioid use and informed consent requirements. That turns the presumption against preemption on its head and leaves emergency rooms unregulated under state law. It's unsurprising that no court has endorsed such an expansive view of EMTALA. And until Dobbs, nor had HHF, everyone understands that licensing laws limit medical practice. That's why a nurse isn't available to perform open-heart surgery, no matter the need, no matter her knowledge. The answer doesn't change just because we're talking about abortion. The Court should reject the administration's unlimited reading of EMTALA and reverse the district court's judgment. I welcome the Court's questions. Normally, when we have a preemption case, there's some relationship between the parties. Is the state being regulated by the federal government under EMTALA, or is the state engaged in some sort of quasi-contractual relationship? Yes, Your Honor. In this case, Idaho, for example, has no state hospitals that participate with the emergency rooms in EMTALA. So in this case, there isn't even a quasi-relationship. The party is being regulated by EMTALA. Here are hospitals and doctors. I think your question is getting at the Armstrong issue, and we think that is a significant question. It wasn't part of the question presented. We think the Indiana amicus brief raises significant questions and deals with that argument well. But the question presented here is one of direct conflict between Idaho's law and EMTALA, and on that question, we don't think it's hard at all. And, Your Honors, going to that direct conflict, I think if you consider the express limitation within the statute of availability. Well, before we do that, can I just step back and get your understanding of the statute? You made some representations as to how you see it working, and so let me tell you what I think, and then you can tell me whether you agree, disagree, or otherwise. So I think that there are two things that are pretty plain on the face of this statute. One is that EMTALA is about the provision of stabilizing care for people who are experiencing emergency medical conditions. That's one thing I think the statute is doing. And I also think that it is operating to displace the prerogatives of hospitals or states or whomever with respect to that fairly narrow slice of the health care universe. This idea of emergency medical services is like one very minor part or small part of the sort of overall health care provision of health care. So what that means is that when a hospital wants to only provide stabilizing care in emergencies for people who can pay for it, for example, EMTALA says, no, I'm sorry, you have to stabilize anyone who's experiencing an emergency medical condition. Or when a hospital wants to provide stabilizing treatments to people who are experiencing only certain kinds of emergency conditions, EMTALA says, no, here's the list of conditions, and you have to provide stabilizing care for those people. Similarly, if a state says, look, it's our job to govern all of health care in our state, and we say that only certain kinds of health care can be given to people who are experiencing emergency medical conditions, we don't want whatever treatment, we want only certain kinds of treatment, EMTALA says, no, we are directing that as a matter of federal law, when someone presents with an emergency condition, they have to be assessed, and the hospital must do whatever is in its capacity to stabilize them. Is that your understanding of the statute? Partially, Your Honor. We agree that EMTALA does impose a federal stabilization requirement, but the question here is what is the content of that stabilization requirement? And for that, you have to reference state law. What you just said is important, because when you concede that EMTALA imposes a stabilization requirement, it is this statute, the federal government, interfering, if you will, in a state's health care choices. So EMTALA is on its face a statute that says it's not all the state's way. There are federal requirements here. There is a requirement to stabilize emergency patients, and you agree with that. Justice Kagan, we agree that EMTALA's purpose was narrow to bridge this gap that existed in some cases. We can just take off the table this idea that just because it's a state and it's health care, that the federal government has nothing to say about it. The federal government has plenty to say about it in this statute. Now, you're right. Now there's a question of what's the content of this stabilization requirement? And as far as I understood your opening remarks, you say, well, this is left to the states. But if I'm just looking at the statute, the statute tells you what the content of the stabilization requirement is. It's to provide such medical treatment as may be necessary to assure, within reasonable probability, that no material deterioration of the condition is likely to occur if the person were transferred or didn't get care. So it tells you very clearly it's an objective standard. It's basically, you know, it's a standard that clearly has reference to accepted medical practice, not just whatever one doctor happens to think. But it's here is the content of the standard. You have to stabilize. What does that mean? It means to provide the treatment necessary to assure, within reasonable medical probability, that no material deterioration occurs. Yeah. Let me respond in two ways. First, the objective standard that you set forth there and that understanding is contrary to the administration's view. They say it is a totally subjective standard, and whatever treatment a doctor determines is appropriate. I think that that's not true. I mean, I think you guys can argue about this yourself. But as I understand, the Solicitor General's brief, and we'll see what the Solicitor General says, but the Solicitor General says it's not up to every individual doctor. This is a standard that is objective, that incorporates accepted medical standards of care. Well, and the more fundamental point is the definition that you quoted of stabilizing care in the operative provision in B-1 is also textually explicitly qualified by that which is within the staff and facilities available at a hospital. That's quite right. It says within the staff and facilities available at the hospital. And if you just look at that language, I mean, it's absolutely clear that that's not a reference to what state law involves. The staff and facilities available. If you don't have staff available to provide the medical care, then I guess you can't provide the medical care. If you don't have the facilities available to provide the medical care, then you can't provide the medical care. A transfer has to take place for the good of the patient. This is a really important... This is the availability here. It's the availability of staff and facilities. You know, do you have the right doctors? Do you have enough doctors? Do you have the right facilities? Or is it better for the patient to transfer them to the hospital a few miles away? You're exactly right. Do you have the right doctors? How do you answer that question except by reference to state licensing laws? But you absolutely can't do that. I mean, that's sort of the initial point that I was trying to make, which is that the federal mandate is to provide stabilizing care for emergency conditions, regardless of any other directive that the state has or the hospital has that would prevent that care from being provided. That's the work of the statute. Justice Jackson, that's not even HHS's conclusion. In the state operations manual, which they proffered on page 36 of the brief, it defines what makes a staff person available under the statute. And they say it has to... And does it say that they're not available if state law doesn't allow this procedure? It says they are available to the extent they are operating within the scope of their medical license. And that is our argument. They want to now draw it far more narrow and look only at physical availability. We agree. That's a component. But there's also a legal availability component here, too. Counsel, the problem we're having right now is that you're sort of putting preemption on its head. The whole purpose of preemption is to say that if the state passes a law that violates federal law, the state law is no longer effective. So there is no state licensing law that would permit you, permit the state to say, don't treat diabetics with insulin. Treat them only with pills, metformin. And a doctor looks at a juvenile diabetic and says, without insulin, they're going to get seriously ill. And the likelihood, and I don't know what that means under Idaho law. We'll get to that shortly. Because, I don't know, we believe this is a better treatment. Federal law would say, you can't do that. Medically accepted, objective medically accepted standards of care require the treatment of diabetics with insulin. The medically accepted obligation of doctors when they have women with certain conditions, that may not result in death, but more than likely will result in very serious medical conditions, including blindness for some, for others the loss of organs, for some chronic blood strokes. Idaho is saying, unless the doctor can say, in good faith, that this person's death is likely, as opposed to serious illness, they can't perform the abortion. So I don't know your argument about state licensing law, because this is what this law does. It tells states, your licensing laws can't take out objective medical conditions that could save a person from serious injury or death. I think there are two crucial responses to your point. Let me begin with the preemption point. Subdivision F and section 1395 actually are telling HHS, the federal government, and courts just the opposite. No, it's saying you can't preempt unless there's a direct conflict. If objective medical care requires you to treat women who present the potential of serious medical complications, and the abortion is the only thing that can prevent that, you have to do it. Idaho law says the doctor has to determine not that there's merely a serious medical condition, but that the person will die. That's a huge difference, Kelsey. We agree that there is daylight between how the administration is reading EMTALA and what Idaho's Defense of Life Act permits. We agree that there's a controversy here, but what I'm saying is that... No, no, no, no, there's more than a controversy. Because what you're saying to us is that if EMTALA doesn't have preemptive force, then not just Idaho, it has a saving condition for abortions when it threatens a woman's life. But what you're saying is that no state in the nation, and there are some right now, that don't even have that as an exception to their anti-abortion laws. What you are saying is that there is no federal law on the book that prohibits any state from saying, even if a woman will die, you can't perform an abortion. I know of no state that does not include a life-saving exception. Some have been debating it at least, and if I find one, but your theory of this case leads to that conclusion. I think our point is that EMTALA doesn't address that very... Could I hear your answer? Yeah. The administration's reliance on a standard, like best clinical evidence, or some national norm, I think that's very fraught, because what it really is saying is, the text itself doesn't address what stabilizing treatment is required. You go outside the text to professional standards that are floating out there that might change day to day, and that really boils down to a question between a conflict between what ACOG says and what Idaho law says. Thank you. Actually, can I just clarify, because I'm not sure I understand. Looking at this from a broader perspective, it seems to me that EMTALA says, you must provide whatever treatment you have the capacity, meaning staff and facilities, to stabilize patients who are experiencing emergency medical conditions. Idaho law seems to say you cannot provide that treatment unless doing so is necessary to prevent a patient's death to the extent the treatment involves abortion. Why is that not a direct conflict? You have, you must, in a certain situation, that's what the federal government is saying, and you cannot if it involves abortion, says Idaho. I think the nurse example really highlights the reason why. Because a nurse might be available. The nurse may even think she knows how to, and under the flat must provision in EMTALA, the administration's reading would say, call her into action, put her into the operating room, and open the patient up. Right, and Idaho would say, no, that's still a conflict. So fine, let's say the administration's position is that nurse can do it. Are you suggesting that federal law would not take precedence, would not preempt a state law that says, no, she can't? Well, whether federal law could do that is a different question than whether EMTALA here does do that. And I think the answer is clear, that it doesn't. I mean, it's like the Gonzales v. Oregon case, where the Controlled Substances Act, this court noted that the provisions there rely upon and assume a medical profession being regulated by state police powers. That's the same with EMTALA. EMTALA is a four-page statute. Congress didn't attempt to address the standards of care for every conceivable medical treatment. It definitely didn't address the standards of care. It did leave that to the medical community. Congress was not going to address every treatment for every condition. But it said, you do what is needed to assure non-deterioration. So I guess the question here is, do you concede that with respect to certain medical conditions, an abortion is the standard of care? No, because the standard of care under... Well, I should say, in Idaho, there is a life-saving exception for certain abortions. And that is the standard of care. And the standard of care is necessarily set and determined by state law. Well, I think you have to concede that with respect to certain medical conditions, abortion is the standard of care, because your own statute, as interpreted by your own courts, acknowledges that when a condition gets bad enough, such that the woman's life is in peril, then the doctors are supposed to give abortions. And the reason that that's true is that with respect to certain rare but extremely obviously important conditions and circumstances, abortion is the accepted medical standard of care. Isn't that right? Yes, and that was my point, that there is a life-saving exception under Idaho law. Now the question here... Now the question is, is it also the accepted standard of care when, rather than the woman's life being in peril, the woman's health is in peril? So let's take, you know, all of these cases are rare, but within these rare cases, there's a significant number where the woman is... She's going to lose the ability to have children in the future, unless an abortion takes place. Now that's the category of cases in which MTALA says, my gosh, of course the abortion is necessary to assure that no material deterioration occurs. And yet Idaho says, sorry, no abortion here. And the result is that these patients are now helicoptered out of state. The hypothetical you raise is a very difficult situation. And these situations, I mean, nobody's arguing that they don't raise tough medical questions that implicate deeply theological and moral questions. And Idaho, like 22 other states, and even Congress and MTALA, recognizes that there are two patients to consider in those circumstances. And the two-patient scenario is tough when you have these competing interests. You know, that would be a good response if federal law did not take a position on what you characterize as a tough question. But federal law does take a position on that question. It says that you don't have to wait until the person is on the verge of death. If the woman is going to lose her reproductive organs, that's enough to trigger this duty on the part of the hospital to stabilize the patient. And the way to stabilize patients in these circumstances, all doctors agree. And Idaho law does not require that doctors wait until a patient is on the verge of death. There is no imminency requirement. There is no medical certainty requirement. I'm sorry. Answer the following question. And these are hypotheticals that are true. Hold on one second. And you can tell me whether Idaho's exception, and we still go back to the point that even if Idaho law fully complies with federal law, you have a pregnant woman who is early into her second tri-semester at 16 weeks, goes to the ER because she felt a gush of fluid leave her body. She was diagnosed with T-PROG. The doctors believe that a medical intervention to terminate her pregnancy is needed to reduce the real medical possibility of experiencing sepsis and uncontrolled hemorrhage from the broken sac. This is a story of a real woman. She was discharged in Florida because the fetus still had fetal tones. And the hospital said, she's not likely to die, but there are going to be serious medical complications. The doctors there refused to treat her because they couldn't say she would die. She was horrified, went home. The next day, she bled. She passed out, thankfully taken to the hospital. There, she received an abortion because she was about to die. What you are telling us, is that a case in which Idaho, the day before, would have said it's okay to have an abortion? Under Idaho's life-saving exception, a doctor could in good faith, if the doctor could in good faith, medical judgment, determine... No, I'm asking you. The Florida doctor said, I can't say she's going to die. Your Honor, my point is... If your doctor says, I can't with a medical certainty say she's going to die, but I do know she's going to bleed to death if we don't have an abortion, but she's not bleeding yet, so I'm not sure. The doctor doesn't need to have medical certainty. Counsel, answer yes or no. He doesn't have, he doesn't, cannot say that there's likely death. He can say there is likely to be a very serious medical condition, like a hysterectomy. Let me go to another one. Imagine a patient who goes to the ER with pre-op, 14 weeks. Again, abortion is accepted. She was in and out of the hospital up to 27 weeks. This particular patient, they tried, had to deliver her baby. The baby died. She had a hysterectomy, and she can no longer have children. All right, you're telling me the doctor there couldn't have done the abortion earlier? Again, it goes back to whether a doctor can, in good faith medical judgment... That's a lot for the doctor to risk. I think it's protective of doctor judgment, Your Honor. When Idaho law changed to make the issue whether she's going to die or not or whether she's going to have a serious medical condition. There's a big daylight by your standards, correct? It is very case-by-case. That's the problem. I'm kind of shocked, actually, because I thought your own expert had said below that these kinds of cases were covered, and you're now saying they're not? No, I'm not saying that. That's just my point, Your Honor, is that... Well, you're hedging. I mean, Justice Sotomayor is asking you would this be covered or not, and it was my understanding that the legislature's witnesses said that these would be covered. Yeah, and those doctors said if they were exercising their medical judgment, they could, in good faith, determine that life-saving care was necessary. And that's my point. Is this a subjective... But some doctors couldn't. Some doctors might reach a contrary conclusion, I think, as Justice Sotomayor is asking you. If they reached the conclusion that the legislature's doctors did, would they be prosecuted under Idaho law? No, no. If they reached the conclusion that Dr. Reynolds, Dr. White did, that these were life-saving... What if the prosecutor thought differently? What if the prosecutor thought, well, I don't think any good-faith doctor could draw that conclusion. I'm going to put on my expert. And that, Your Honor, is the nature of prosecutorial discretion, and it may result in a case that... Does Idaho put out any kind of guidance? You know, HHS puts out guidance about what's covered by the law and what's not. Does Idaho? There are regulations. DAPA has some regulations. But I think the guiding star here is the Planned Parenthood v. Washington case, which is a lengthy, detailed treatment by the Idaho Supreme Court of this law. And it made clear, the court made clear, that there is no medical certainty requirement. You do not have to wait for the mother to be facing death. Thank you, counsel. Is there... What happens if a dispute arises with respect to whether or not the doctor was within the confines of Idaho law or wasn't? Is the doctor subjected to review by a medical authority? Exactly how is that evaluated? Because it's an obvious concern if you have an individual exception for a doctor, and we're having a debate about, is that covered by your submission that nothing in Idaho law prohibits complying with EMTALA? I mean, who makes the decision of whether or not something's within or without? So, I mean, I imagine there are two ways the law can be enforced, or at least two. The Board of Medicine has a licensing oversight over a doctor, and the Idaho Supreme Court made clear that that doctor's medical judgment is not going to be judged based on an objective standard, what a reasonable doctor would do. That's not the standard. The second way would be if a... What is the standard? The doctor's good faith medical judgment, which is subjective. And that's not subject to review by any medical board? If there's a complaint against the doctor that his standards don't comply and say he's the only doctor at the particular emergency room, and he has his own particular standard? What the Idaho Supreme Court has said is that you may consider another doctor's opinion only on the question of, was it a pretextual medical judgment, not a good faith one. Thank you. Justice Thomas? Justice Alito? Well, I would think that the concept of good faith medical judgment must take into account some objective standards, but it would leave a certain amount of leeway for an individual doctor. That was how I interpreted what the state Supreme Court said. Now, you have been presented here today with very quick summaries of cases and asked to provide a snap judgment about what would be appropriate in those particular cases. And honestly, I think you've hardly been given an opportunity to answer some of the hypotheticals, but would you agree with me that if a medical doctor who is an expert in this field were asked, bang, bang, bang, what would you do in these particular circumstances, which I am now going to enumerate, the doctor would say, well, this is not how I practice medicine. I need to know a lot more about the individual case. Would you agree with that? Absolutely. And ACOG has, you know, in the case of PROM, for example, ACOG doesn't just knee-jerk say an abortion is the standard of care. ACOG itself says that expectant management is oftentimes the appropriate standard of care. And so these are difficult questions that turn on the facts that are on the ground between the doctor as he is assessing them with his medical judgment that he's bringing to bear, but is also necessarily constrained by Idaho law, just like every other area of the practice of medicine. State law confines doctor judgment in some ways. Thank you. Justice Sotomayor? There is a difference between stabilizing a person who presents a serious medical condition requiring stabilization than a person who presents with a condition, quoting Idaho's words, where there is a poses a great risk of death to the pregnant woman. Do you agree there's daylight between the two? We agree. And I think this is most important. And so there will be some women who present serious medical condition that the federal law would require to be treated who will not be treated under Idaho law. No, I disagree with that. Idaho hospitals are treating these women. They're not treating these women with abortions necessarily, Your Honor. That's my point. Just answer the point, which is they will present with a serious medical condition that doctors in good faith can't say will present death, but will present potential loss of life. Those doctors, potential loss of an organ or serious medical complications for the woman, they can't perform those abortions. Your Honor, if that hypothetical exists, and I don't know of a condition that is so certain to result in the loss of an organ but also so certain not to transpire with death, if that condition exists, yes, Idaho law does say that abortions in that case aren't allowed. All right. Let me stop you there because all of your legal theories rely on us holding that federal law doesn't require, cannot preempt state law on these issues. And so when I asked you the question, if a state defines likelihood of death more stringently than Idaho does, you would say there's no federal law that would prohibit them from doing that. Well, I would say that EMTALA does not contain a standard of care. So there is no standard of care. In your briefing, you made the SG's position here, and you almost argue that now, that their position that federal law requires stabilizing treatment and not equal treatment of patients, which was a position you took in your brief. You seem to have backed off from it here. You seem to agree that federal law requires some stabilizing condition, whether or not you provide it to other patients. But I have countless briefs that say that HHS has filed that pre-DOPS, pre-2009, this is not an unprecedented position, that HHS in countless situations cited hospitals for discharging patients who required an abortion as a stabilizing treatment. Congress discussed that topic in the Affordable Care Act and explicitly said that nothing in the Affordable Care Act shall be construed to relieve any health care provider from providing emergency services as required by state or federal law. Medical providers have told us that for decades, they have understood both federal law and state law to require abortions as stabilizing conditions for people presenting serious medical risk. Lower courts, there's at least cases of lower courts saying you have to provide abortion. So this is not a post-DOPS unprecedented position by the government. It absolutely is. In footnote two, the administration cites two spreadsheets that contain 115,000 rows of enforcement instances. The administration has not identified a single instance. In terms of pre-DOPS, this wasn't much of a question, but there is HHS guidance and there's at least three cases in which it was invoked. The fact that HHS didn't have to do it much before pre-DOPS doesn't make their position unprecedented. My point is more fundamental, Your Honor. It's not just that there are few instances. There are no instances, and not just on the issue of abortion. On any instance where HHS has come in and told a hospital, you have to provide a treatment that is contrary to state law. And this isn't just about abortion. Now we're back to that. Okay. Thank you. Justice Kagan. Mr. Turner, practicing medicine is hard, but there are standards of care, aren't there? Yes, there are. And one of those standards of care with respect to abortion is that in certain tragic circumstances, as you yourself, as your own state's law acknowledges, where a woman's life is in peril and abortion is the appropriate standard of care, isn't that right? That's right. And EMTALA goes further. It says that the appropriate standard of care can't only be about protecting a woman's life. It also has to be about protecting a woman's health. That's what EMTALA says, doesn't it? No, it doesn't. It defines emergency medical condition with a broader set of triggering conditions, but the key question here is what is the stabilization requirement, and that is qualified by the availability term. The stabilization requirement is written in terms of making sure that a transfer would not result in a material deterioration as to the emergency condition. Nothing about it has to be a death store, right? I think that's right, yes. And there is a standard of care with respect to that on abortions too, right? If a woman is going to lose her reproductive organs unless she has an abortion, which happens in certain tragic circumstances, a doctor is supposed to provide an abortion, isn't that right? EMTALA doesn't contain any standard of care. I don't know where the administration is... Do you dispute that there's a medical standard of care that when a woman is about to lose her reproductive organs unless she has an abortion, that doctors would not say that an abortion is the appropriate standard of care in that situation? What I dispute is that there's a national uniform standard of care that requires a top-down approach in all states. Idaho has set its own standard of care, and it has drawn the line on a difficult question, and it's inconceivable to me to think that Congress attempted to answer this very fraught, complicated question in four pages of the U.S. Code. Congress said, as to any condition in the world, if an emergency patient comes in, you're supposed to provide the emergency care that will ensure that that patient does not see a material deterioration in their health. That's what Congress said. And the abortion exceptionalism here is on the part of the state saying we're going to accept that with respect to every other condition, but not with respect to abortion, where we will not comply with the standard of care that doctors have accepted. Your Honor, abortion isn't exceptional. There are numerous cases where states intervene and say the standard of care in this circumstance for this condition is X, not Y. Opioids, for example. In New Jersey, a doctor cannot stabilize chronic pain with more than a five-day supply of opioids. In Pennsylvania, it can be seven. In other states, there's no limit. Their reading of EMTALA requires that those limitations get wiped out and you impose a national standard. There are numerous other instances where states are coming in and saying, in our state, the practice of medicine must conform to this standard. And I know who has done that with abortion. It's done it with opioids. It's done it with marijuana use. There are countless examples, Your Honor. In your theory, although the Supreme Court has narrowed the reach of your statute, your theory would apply even if it hadn't. I mean, it would apply to ectopic pregnancies. It would apply even if there were not a death exception. I mean, all of your theory would apply no matter what, really, Idaho did, wouldn't it? Yeah, I think the answer is EMTALA doesn't speak to that, but there are other background principles and limitations like rational basis review, justice request, the Chief Justice's recognition... But your theory of EMTALA is that EMTALA preempts none of it, that a state tomorrow could say even if death is around the corner, a state tomorrow could say even if there's an ectopic pregnancy, that still, that's a choice of the state and EMTALA has nothing to say about it. And that understanding is a humble one with respect to the federalism role of states. It's the primary care providers for their citizens, not the federal government. It may be too humble for women's health, you know? Okay, thank you. Justice Gorsuch? I just wanted to understand some of your responses or efforts to respond to some of the questions that we've heard today. As I read your briefs, you thought that Idaho thinks that in cases of molar and ectopic pregnancies, for example, that an abortion is acceptable. Correct. And the example of someone who isn't immediately going to die but may at some point in the future, that that would be acceptable. It goes back to the good faith medical standard, but yes, if the doctor cannot determine in good faith that death is going to afflict that woman, then no abortion... So it doesn't matter whether it happens tomorrow or next week or a month from now. There is no imminency requirement. This whole notion of delayed care is just not consistent with the Idaho Supreme Court's reading of the statute and what the statute says. And the good faith, as I read the Idaho Supreme Court opinion, that that controls. That's the end of it. Absolutely it is. All right. And then what do we do with EMTALA's definition of individual to include both the woman and, as the statute says, the unborn child? Yeah. We're not saying, Your Honor, that EMTALA prohibits abortions. So, for example, in California, stabilizing treatment may involve abortions consistent with what that state law allows its doctors to perform. But I think our point with the unborn child amendment in 1989 is that it would be a very strange thing for Congress to expressly amend EMTALA to require care for unborn children. And it's not just when the mother is experiencing active labor. The definition of emergency medical condition requires care when the child itself has an emergency medical condition, regardless of what's going on with the mother. And so it would be a strange thing for Congress to have regard for the unborn child and yet also be mandating termination of unborn children. Justice Kavanaugh? I just want to focus on the actual dispute as it exists now, today, between the government's view of EMTALA and Idaho law, because Idaho law has changed since the time of the district court's injunction, both with the Idaho Supreme Court and with a clarifying change by the Idaho legislature. You say in your reply brief, and so, too, the Moyle reply brief, says that for each of the conditions identified by the Solicitor General where, under their view of EMTALA, an abortion must be available, you say in the reply brief that Idaho law, in fact, allows an abortion in each of those circumstances. And you go through them on pages 8 and 9 of the reply brief, each of the conditions. Is there any condition that you're aware of where the Solicitor General says EMTALA requires that an abortion be available in an emergency circumstance where Idaho law, as currently stated, does not? Certainly, the administration maintains that there is such conditions. The ones they identify in the metadata... What is your view? And my view is that, yes, and I'm going to reference footnote 5 from the gray brief, the mental health condition situation. The administration says that's not on the table, that's not a scenario where abortion is the only stabilizing care required, and I'm not sure where that construct of only stabilizing care comes from, because, under their view, it's the doctor's determination that controls, not this imposed only requirement. But be that as it may, the American Psychiatric Association, and so I'm taking General Prelogger up on her offer in footnote 5, that there are no professional organizations that set abortion as a standard of care. The American Psychiatric Association, in a 2023 position paper, says that abortions are imperative for mental health conditions. That sounds like a necessity to me, and I don't know how, if a woman presents at seven months pregnant in an Idaho emergency room and says, I'm experiencing severe depression from this pregnancy, I'm having suicidal ideation from carrying this pregnancy forth, that that wouldn't, under the administration's reading, be the only stabilizing care. So you think the Ninth Circuit panel, when it said, every circumstance described by the administration's declarations involved life-threatening circumstances under which Idaho law would allow an abortion, is what the Ninth Circuit panel said. We agree with that, because the conditions identified in the affidavits were all conditions that would fit under the life-saving exception. And that's telling, because these doctors, when put under oath in an affidavit, couldn't come up with any of these harrowing circumstances. They identified other ones. But I think what the government doesn't want to talk about, again, is the mental health exception here. I just don't know how you can read their understanding. I'm just trying to figure out, is there really, other than the mental health, which we haven't had a lot of briefing about, is there any other condition identified by the Solicitor General where you think Idaho law would not allow a physician, in his or her good faith judgment, to perform an emergency abortion? Not in their affidavits. They maintain, nonetheless, that when you compare the definition of what an emergency medical condition is, it is broader than the definition of the life-saving exception in Idaho law. And so they present... Well, that's what they say. But then when we get down to the actual conditions that are listed, the examples, and Justice Sotomayor was going through some of those, you have said, in your brief at least, that each of the conditions identified by the government, actually Idaho law allows an emergency abortion. And I agree. And I think the injunction here is also... What does that mean for what we're deciding here? Well, what it means... If Idaho law allows an abortion in each of the emergency circumstances that is identified by the government, then there's no reason for the government, as I'm mandating, that it be allowed. I'll say two things. I mean, the real practical first response is that Idaho is under an injunction that includes an incredibly broad requirement that preempts... Right, I understand that. And that may mean that there shouldn't be an injunction. I take your point on that. What's your second? My second point, Your Honor, is I don't know how this court can make the determination on whether there are any real-world conditions without first answering the statutory interpretation question of what an intolerance stabilization requirement actually requires. That has to be addressed. It has to be addressed not only because that's... Well, I was just picking up on your reply brief. You're the one who said it in your reply brief that there's actually no real daylight here in terms of the conditions. So I'm just picking up on what you all said. Yeah, I understand, Your Honor. Thank you. Justice Barrett? I guess I don't really understand why we have to address the stabilizing condition if what you say is that nobody has been able to identify a conflict. And in the mental health thing, the SG says, I just picked it up to check, footnote 5, Idaho badly errs in asserting that construing a tile according to its terms would turn emergency rooms into federal abortion enclaves by allowing pregnancy termination for mental health concerns. So if that's the only space that you can identify where Idaho would preclude an abortion and EMTALA would require one and the government is saying, no, that's not so, what's the conflict? I mean, of course we think we win whether you find no factual conflict and therefore the injunction has to go away. But why? Why are you here? I mean, you know, the government says it. Well, hold on a second. You're here because there's an injunction precluding you from enforcing your law. And if your law can fully operate because EMTALA doesn't curb Idaho's authority to enforce its law... Well, it can't under the injunction. The injunction says that Idaho's law is preempted in an incredibly broad range of circumstances to avoid... As it conflicts with EMTALA, I thought. It is much broader than that. And this was based on the proffered injunction by the administration to avoid an emergency medical condition, not in the face of an emergency medical condition. So what that means is Idaho's law can't even operate when a doctor determines that a condition might need to be avoided. That hasn't yet presented itself. That's far broader than the emergency medical condition and stabilization requirement under EMTALA because the stabilization requirement under EMTALA is only triggered when there has been a determination... Okay, well, I would like to hear the Solicitor General's response to that. But let me just ask you one other thing about the mental health consideration. Because I can understand Idaho's point that a mental health exception would be far broader than Idaho law and have the potential to expand the availability of abortion far beyond what Idaho law permits. But the stabilization requirement only exists up until transfer, right? Until transfer is possible. So it's hard for me to see how with a mental health condition that couldn't be stabilized before needing to transfer, right? At that point, the Idaho hospital could say, well, you're stable. You're not immediately going to be suicidal. We'll leave you in the care of a parent or partner who will then seek appropriate treatment. Well, that flexible view of stabilization is very different than the government's very rigid view of stabilization, which is if an emergency medical condition calls for an abortion, it's got to be provided right there and then if it's available in this very limited sense. And so the stabilization continuum that you're talking about, I agree. That's built into emtology. But statute says until transfer is possible. Well, the transfer provision kicks in if a hospital is unable to stabilize a condition. And so if a patient presents at a hospital and that hospital has the capability, the availability to stabilize a condition, in the case of mental health, I invite General Prelogger to come up here and tell you that I've got it all wrong and that the mother that I described would not need to receive stabilization in that circumstance and instead would be transferred to a psychiatric hospital or something and that wouldn't constitute dumping under their reading. I just don't see how that comports with everything they've said about the rigid view of stabilization, that if a condition calls for it and a hospital can do it, it's got to be done there and then. Does Idaho have any kind of conscience exemption for doctors under state law? It does, and there are federal conscience protections as well. And I think that is a key point here, Your Honor. The administration told this court in the FDA case that individual doctors are never required to perform an abortion, from what I could tell, but that doesn't extend to hospitals. And so in the case of Catholic hospitals, and there are hundreds of them treating billions of patients every year, under the administration's reading, Catholic hospitals who faithfully adhere to the ethical and religious directives are now required to perform abortions. Is that because no federal conscience exemption applies? I don't know why they say that's the line that they draw between individual doctors and religious institutions, because Coates Snow, on its face, seems to cover both. Okay, thank you. Justice Jackson? I'm really surprised to hear you say that Idaho law permits everything that the federal law requires. So I'm trying to understand that, because it seems to me that if that's the case, then why couldn't emergency room physicians in Idaho just ignore Idaho law and follow the federal standard? I mean, if the state is doing exactly what the federal law says is required, if it's okay by Idaho, then fine. We set Idaho aside, we do what the federal law says, and we all go home. Well, I mean, our reading, of course, is that there is no conflict, and so doctors aren't having to make this choice of do I follow EMTALA or do I follow... Your representation on behalf of Idaho is that if an emergency room physician in Idaho follows EMTALA in terms of when an abortion is required to stabilize a patient, they will be complying with Idaho law such that there's going to be no prosecution and no problem. Yes, because they have to comply with Idaho law to comply with EMTALA. No, no. I'm asking you, if they comply with EMTALA, will they necessarily have satisfied the requirements of Idaho law? Because that's what you seem to say in response to Justice Kavanaugh and in response to Justice Barrett. So I just want to make clear if that's the position of the state. EMTALA... The scope of EMTALA stabilization requirement is necessarily determined by Idaho law in this case. So... No, you're saying if they follow Idaho law, then they will be following EMTALA law. Well, I think it's guilt, Your Honor. No, it's not. I'd like for you to entertain the other possibility. You seem to be saying every situation in which the United States says here's a stabilization situation that the United States would say the person has to have an abortion, the physicians would say we're following EMTALA and abortion is required. I thought you said in response to Justice Kavanaugh, yes, Idaho law would also say that's the situation in which an abortion is allowed. If that's the case, then it seems to me there is no daylight, there's no conflict, as you've said, but it's because Idaho law is in full compliance with what the federal law is saying. We're getting it wrong, you're saying. Like this death thing, that's not what we really mean. What we mean is whenever it's necessary to stabilize a patient who is experiencing deterioration as federal law requires. No, I think I understand the point that you're making, and the best way that I can think of it, Your Honor, is that EMTALA's stabilization requirement requires medical judgment to determine what is the appropriate stabilizing treatment, right? And how does a doctor exercise medical judgment? Well, his training, his experience, is perhaps referenced to professional standards of care that are national, but necessarily state law standards as well. How about, that's not just something you're sort of coming up with. I mean, as Justice Kagan said at the beginning, EMTALA tells the doctor how he's supposed to decide it in this particular circumstance, with reference to the medical standards of care concerning when a patient is deteriorating in an emergency condition situation. So if that's the standard in EMTALA, are you representing that that is exactly what Idaho is saying so that all the doctors need to do is follow EMTALA and they'll be fine under Idaho law? Well, of course we're saying that Idaho doctors need to comply with EMTALA. The question is how do doctors comply with EMTALA? Let me ask you another question. I think I understand your point. You're saying Idaho could actually be requiring more and the federal law has to make them do what Idaho says. Well, and it's important that EMTALA itself, it codifies this presumption of a backdrop of state law. There are background principles here. All right, let me explore that with you for just a second. I had thought that this case was about preemption and that the entirety of our preemption jurisprudence is the notion that the federal government, in certain circumstances, can make policy pronouncements that differ from what the state may want or what anybody else may want, and the supremacy clause says that what the federal government says takes precedent. So you've been saying over and over again, Idaho is a state and we have health care policy choices and we've set a standard of care in this situation. All that's true. But the question is to what extent can the federal government say, no, in this situation, our standard is going to apply? That's what the government is saying and I don't understand how consistent with our preemption jurisprudence you can be saying otherwise. If I could put a finer point on it, I don't think the question is necessarily what can Congress do, but what did Congress do here with EMTALA? All right, so what did it do here? Yeah, it started, it opened the Medicare Act by saying the federal government shall not control the practice of medicine. And then in EMTALA itself it says state laws are not preempted. State laws are not preempted to the extent or only preempted to the extent of a direct conflict. And so now we are identifying a direct conflict. So why is preemption not working there? And whether there's a direct conflict based on this court's long-standing precedent includes clear statement canons that we think we went on the text. Let me be very clear. The text to us is very clear. It's an easy question. But the government's got to overcome a lot of other hurdles. I hear you saying two things. There's not a direct conflict because everything we, the federal government requires, we allow, which the Amici Physicians for Human Rights who've looked at Idaho's law and says it prevents a lot of things in circumstances in which the federal government would require them, they disagree with you on the facts. But anyway, you say no conflict because we actually are doing exactly what, or allowing exactly what the federal government allows. And you say no conflict because the federal government in this situation wanted states to be able to set the standards. And I guess I don't understand how that's even conceivable given this standard, given this statute that is coming in to displace state prerogatives. And if I can't convince you on this, let me add a third. Yeah, please. And there's a clear statement canon. So the spending clause condition nature of this requires Congress to speak clearly and unequivocally that it is imposing an abortion mandate. That's not here in the statute. But doesn't that make abortion different? I mean, what do you mean? They say provide whatever is necessary to stabilize. So you're saying they'd have to say provide whatever is necessary, including abortion? That's the only way that is taken account of here? No, what I'm saying is when we go and look at the phrase available and what it means, the administration is saying, well, they're adding this tag that says consistent with state law. And we're saying, no, under the clear statement canon, it's a presumption against preemption. What the government actually, what Congress would need to do if it wanted to preempt this very traditional area of state law is to put a tag regardless of state law, and that is missing. Thank you. Thank you, Counsel. General Preliger? Mr. Chief Justice, and may it please the Court, EMTALA's promise is simple but profound. No one who comes to an emergency room in need of urgent treatment should be denied necessary stabilizing care. This case is about how that guarantee applies to pregnant women in medical crisis. In some tragic cases, women suffer emergency complications that make continuing their pregnancy a grave threat to their lives or their health. A woman whose amniotic sac has ruptured prematurely, for example, needs immediate treatment to avoid a serious risk of infection that could cascade into sepsis and the risk of hysterectomy. A woman with severe preeclampsia can face a high risk of kidney failure that could require lifelong dialysis. In cases like these where there is no other way to stabilize the woman's medical condition and prevent her from deteriorating, EMTALA's plain text requires that she be offered pregnancy termination as the necessary treatment, and that's how this law has been understood and applied for decades. That usually poses no conflict with state law. Even states that have sharply restricted access to abortion after dogs generally allow exceptions to safeguard the mother's health. But Idaho makes termination of felony punishable by years of imprisonment unless it's necessary to prevent the woman's death. I think I understood my friend today to acknowledge several times that there is daylight between that standard and the necessary stabilizing treatment that EMTALA would require. And the Idaho Supreme Court recognized the same thing when it specifically contrasted the necessary-to-prevent-death exception and said it was materially narrower than a prior Idaho law that had a health exception that tracked EMTALA. The situation on the ground in Idaho is showing the devastating consequences of that gap. Today, doctors in Idaho and the women in Idaho are in an impossible position. If a woman comes to an emergency room facing a grave threat to her health but she isn't yet facing death, doctors either have to delay treatment and allow her condition to materially deteriorate, or they're airlifting her out of the state so she can get the emergency care that she needs. One hospital system in Idaho says that right now it's having to transfer pregnant women in medical crisis out of the state about once every other week. That's untenable, and EMTALA does not countenance it. None of petitioners' interpretations fit with the text, and so they have tried to make this case be about the broader debate for access to abortion in cases of unwanted pregnancy. But that's not what this case is about at all. Idaho's ban on abortion is enforceable in virtually all of its applications. But in the narrow circumstances involving grave medical emergencies, Idaho cannot criminalize the essential care that EMTALA requires. I welcome the court's questions. General, are you aware of any other spending clause legislation that preempts criminal law? With respect to criminal law, in particular, Justice Thomas, I'm not immediately thinking of relevant cases. We have a whole string side of cases in our brief at page 46 that reflect times where the court has recognized the preemptive force of spending clause legislation, including in situations where the funding restrictions apply to private parties, so that could include the Coventry Health case, for example. Lee Deadwood is another example of this, but I'm not immediately recalling how that would apply in criminal law. Of course, this court hasn't drawn those kinds of distinctions in recognizing the force of the supremacy clause. Now, normally when we have a preemption case, it's a regulated party who is involved in a suit and they use it as an affirmative defense, for example, in Wyatt or something. In this case, you are bringing an action against the state, and the state's not regulated. Are there other examples of these types of suits? Sure. I mean, there are numerous examples where the United States has sought to protect its sovereign interests in situations where a state has done what Idaho has done here and interposed a law that conflicts. So I'd point to Arizona versus United States as an example of that. United States versus Washington. There are a number of cases where this court has recognized that the federal government can protect its interests in this kind of preemption action. And as I mentioned before, the court has a long line of cases recognizing that that preemption principle applies in the context of federal funding restrictions that apply to private parties, too. But even when the party that you're bringing the action against is not the regulated party? That's correct, because what Idaho has done here is directly interfered with the ability of the regulated parties who have taken these funds, federal funds with conditions attached, from being able to comply with the federal law that governs their behavior. Now, this is an essential part of the bargain that the federal government struck with hospitals in substantially investing in their hospital systems. And what the state has done is said, you, through our operation of state law, are no longer permitted to comply with this fundamental stabilization requirement in EMTALA in this narrow category of cases. Well, normally, wouldn't it be the regulated party that would actually be asserting the preemption that you're talking about? Certainly, I can imagine situations, for example, where a regulated party would assert a preemption defense and to say that state law itself is preempted to the extent that it prevents that party from being able to comply with federal law. But I'm not aware of any principle or precedent in this court's case law to suggest that that's the only way for the government to protect its sovereignty. That is the normal way, though. I think that that's often the fact pattern of particular cases. I don't understand how your argument about preemption here squares with the theory of spending clause, of Congress's spending clause power. The theory is Congress can tell a state or any other entity or person, look, here's some money or other thing of value, and if you want to accept it, fine, then you have to accept certain conditions. But how does Congress's ability to do that authorize it to impose duties on another party that has not agreed to accept this money? There are no duties being imposed on Idaho here. It's not required to provide emergency stabilizing treatment itself. The duties are kind of off. All right, not duties. How can you impose restrictions on what Idaho can criminalize simply because hospitals in Idaho have chosen to participate in Medicare? I don't understand how this squares with the whole theory of the spending clause. Well, I think that it squares with this court's long line of precedent cited at page 46 of our paper. I've looked at those cases. I haven't found any square discussion of this particular issue. But I'm interested in the theory. Can you just explain how it works in theory? Sure. So spending clause legislation is federal law. It's passed by both houses of Congress. It's signed by the president. It qualifies as law within the meaning of the supremacy clause. Absolutely, absolutely. And so I think the supremacy clause dictates the relevant principle here. What the law? I'll let you finish, Jessica. Go ahead. In a situation where Congress has enacted law, it has full force and effect under the supremacy clause. And what a state can't do is interpose its own law as a direct obstacle to being able to fulfill the federal funding conditions. And this very justicially doesn't mean no conditions under Medicare are enforceable. No, they're absolutely enforceable against the hospital that chooses to participate. Well, I guess the argument then would be that if a hospital is instead bound by the state law and the state law gets to control, it would mean that hospitals couldn't participate in Medicare at all. And that's not the argument that the state's making here. What it wants is for its hospitals to be able to accept Medicare funding but not have to face the restrictions that are attached to those funds as an essential part of the bargain. And there is no precedent to support that outcome. Well, I just don't think – I don't understand how the theory works. But let me move on to something else. I'm going to try to restate your general theory, and I want you to tell me if this is right. I think your argument is if a woman goes to an emergency room and she has a condition that requires an abortion in order to eliminate quote-unquote serious jeopardy to her quote-unquote health, the hospital must perform the abortion or transfer the woman to another hospital where that can be done. Is that a fair statement of your argument? So it includes not just serious jeopardy to her health but obviously also serious dysfunction of her bodily organs or a serious impairment of her bodily function. And the other caveat I would make is that it would require pregnancy termination only in a circumstance where that's the only possible way to stabilize her and prevent that cascade of health consequences. Does this apply at any point in pregnancy? So the pregnancy complications that we have focused on generally occur in early pregnancy, often before the point of viability. There can be complications that happen after viability, but there the standard of care is to deliver the baby if you need the pregnancy to end because it's causing these severe health consequences for the mom. Well, what if it occurs at a point where delivering the baby is not an option? You're out of the third trimester, but it's really not an option to deliver the baby. You said that you're in the third trimester? No, I'm sorry, out of the first trimester. So if you're contemplating a situation where delivery is not an option, then I think in that circumstance it's the only way to prevent If the primary risk to the woman's health or life is for the pregnancy to end and termination is the only option, then yes, that's the required care that EMTALA has through its stabilization mandate. But critically, in many of these cases, the very same pregnancy complication means the fetus can't survive regardless. I understand that. There's not going to be any way to sustain that pregnancy. Let me ask you squarely the question that was discussed during Mr. Turner's argument. Does the term health in EMTALA mean just physical health or does it also include mental health? There can be grave mental health emergencies, but EMTALA could never require pregnancy termination as the stabilizing care. Why? And here's why. It's because that wouldn't do anything to address the underlying brain chemistry issue that's causing the mental health emergency in the first place. This is not about mental health generally. This is about treatment by ER doctors in an emergency room, and when a woman comes in with some grave mental health emergency, if she happens to be pregnant, it would be incredibly unethical to terminate her pregnancy. She might not be in a position to give any informed consent. Instead, the way you treat mental health emergency is to address what's happening in the brain. If you're having a psychotic episode, you administer antipsychotics. I really want a simple, clear-cut answer to this question so that going forward, everybody will know what the federal government's position is. Does health mean only physical health, or does it also include mental health? With respect to what qualifies as an emergency medical condition, it can include grave mental health emergencies, but let me be very clear about our position. That could never lead to pregnancy termination because that is not the accepted standard of practice to treat any mental health emergency. Does the term serious jeopardy in E11i mean an immediate serious risk, or may a risk of serious consequences at some future point suffice? The standard is defined in terms of whether you need immediate medical treatment. So the relevant question is, in the absence of immediate medical treatment, are you going to have this serious jeopardy to your health, dysfunction of your organs, will your bodily system start shutting down? So it is pegged to the urgency of acute care in an emergency room. So it has to be immediate. The relevant standard under the statute is phrased in terms of whether these consequences will occur without immediate treatment. Yes, so it's focused on the interaction between having some kind of urgent health crisis that takes you to an emergency room in the first place, and then how proximate these consequences are likely to be. Well, there are two different things there. One is whether the woman is in immediate jeopardy, or whether the woman needs immediate care in order to eliminate jeopardy at a later point. So I understand your answer to be that the woman need not be in immediate jeopardy, but if she doesn't get care right away, jeopardy at some future point may suffice. So the statutory standard itself is focused on immediate health risk. It's looking at the possibility that if the woman doesn't get treatment then and there, what will happen, what will reasonably be expected to occur, is that her organs could start shutting down, or she might lose her fertility, or have other serious health consequences. It is focused on this temporal link between the immediate need for treatment, which is, I think, reflective of the fact that Congress was narrowly focused on this emergency acute medical situation. Do the terms impairment to bodily functions or serious dysfunction of any bodily organ or part refer only to permanent impairment or dysfunction? Or does it also refer to temporary impairment or dysfunction? I think it can also refer to temporary impairment, but I'm not sure that it's easy to parse the two. For example, a lot of times a pregnant woman in distress, she might start suffering liver damage or kidney malfunction, and you don't know ex-ante whether that's going to be permanent or not. The instruction that Congress gave in EMTALA is you need to stabilize to guard against those very serious health risks. General, I'd like to just understand kind of the scope of your argument here on the supremacy clause and how it operates in your mind, putting aside this case. Could the federal government condition the receipt of funds on hospitals that they comply with medical ethics rules provided for by the federal government, a medical malpractice regime and a medical licensing regime, such that effectively all state medical malpractice laws, all state medical licensing laws would be preempted? And you're imagining that this is regulatory action or that Congress has passed a statute creating kind of a federal malpractice regime? You call it. I mean, I think I have a broad view of Congress's authority to enact statutes, and so what I'd want to assess in that situation is, you know, whether Congress is acting pursuant to one of its enumerated powers. Spending clause. It's all spending clause. Yeah, so I think that very likely Congress could make those kinds of judgments and attach conditions to the receipt of federal funds. And, you know, in Medicare there are financial conditions. Even if it covers all hospitals in the state and effectively transforms the regulation of medicine into a federal function. You know, there might be a point at which this court thinks that it's really encroaching on the state's prerogatives in ways that are inconsistent with our constitutional structure, but I don't think we're anywhere close to that. But do you see any bounds just in principle? I think the bounds, you know, would have to come from this court's case law concerning federalism principles. The court has said in cases like Gonzalez v. Oregon that, of course, the federal government has authority to comprehensively regulate on health and safety, including with respect to medical care, and so I don't think that there's any principle of exclusive governance of this area by the state. But obviously I'm sure you could construct hypotheticals that really seem to be the federal government entirely taking over a state function, and maybe that would be subject to a different principle. And EMTALA and Medicare allow the federal government to enforce the EMTALA dictate through civil monetary penalties? That's correct, yes. And also you can terminate the Medicare agreements if a hospital violates EMTALA in your view? Yes, generally the hospital is given the opportunity to come into compliance and to develop a plan to ensure that there won't be future EMTALA violations. It would obviously be an extreme sanction to terminate Medicare funding, but that is a possibility. And there's also a private right of action for EMTALA violations that have the possibility of equitable relief as well. Yes, certainly monetary relief and possibly equitable relief as well. In this case, you brought an equitable cause of action. You didn't cite any statute to enforce EMTALA. And one of the rules in equity, traditionally at least, is that you don't get an equitable relief if there's an adequate remedy at law. And as we just discussed, there's a pretty reticulated statute here. The Seminole Tribe says when you have a reticulated statute and lots of remedial options, you don't get equitable relief. Thoughts? So let me say at the outset that the United States has long been recognized to have an action in equity, an inherent action in equity, to appeal to the courts of this nation to protect its sovereign interests. It's proprietary interests. You mentioned Washington and you mentioned Arizona. The United States is another example of that. Arizona was an immigration case and border, and Washington was an attempt by a state to impose its worker compensation laws on the federal government in a way different from others. I take those points, and equity is all about proprietary interests and things like that. Do we have that here? Well, I think that the courts, it's not. I want to make sure to make clear that there are a long line of cases that stand for this principle, including cases that have addressed it directly, like Ingray Debs, Wyandotte. You really want to rely on Debs, General? I mean, that wasn't exactly our brightest moment. I do think, though, that it reflects the history and tradition of this nation in recognizing that it's entirely appropriate for the United States to seek to protect its interests in this manner. And let me say, Justice Gorsuch, this is a really important issue to the United States. It wasn't pressed below. It wasn't passed upon. We haven't briefed it at all. It's not jurisdictional. I'm just trying to understand where it comes from. What is the proprietary interest here? It's your money and how it's being spent, and Congress has given you lots of tools. I think it also comes from the recognition under obstacle preemption principles that there are important functions to be served by having the Medicare program in place, and Idaho has directly interfered with the ability of hospitals to accept these federal funds when they stand willing and able to comply with EMTALA's mandates and fulfill Congress's desire here to make sure that no matter where you are in this country, if you have an urgent medical need and you go to an ER, you can be stabilized. Counsel, your friend on the other side said that your position would require religiously affiliated hospitals with emergency rooms to perform abortions. Was he right? No, my friend was wrong. There are federal conscience protections that apply at the entity level to hospitals as well. The key provisions are in the Weldon Amendment and also Cote Snow, although that depends on the residency program of a particular hospital. Now, HHS said in a 2008 rulemaking on conscience protections that it had never come across a hospital that had a blanket objection to providing life-preserving and health-preserving pregnancy termination care, but if a hospital had that kind of objection, and HHS recently informed me they still have not come across that hospital, that would be honored vis-à-vis HHS's enforcement ability. You said that applies at the entity level. Can individual doctors in the emergency room, do they have a conscience exemption? Oh, yes. They're protected under the church amendments principally, and our position is that EMTALA does not override either set of conscience protections. So if an individual doctor has a conscience objection to providing pregnancy termination, EMTALA itself imposes obligations at the entity level, and the hospital should have plans in place to honor the individual doctor's conscience objection while ensuring appropriate staffing for emergency care. Does that mean that there must be somebody in the emergency room that can provide an abortion? What if there are two doctors, three doctors, and they all have a conscience exemption? No. In that circumstance, EMTALA could not override those individual doctors' conscience protections, but my understanding is that as a matter of best practice, because hospitals want to be able to provide emergency care, they do things like ask doctors to articulate their objections in advance so that that can be taken into account in making staffing decisions and who's on call. Hospitals have a lot of plans in place for these kinds of contingencies. Are you saying that there must be somebody available and on call in a hospital of that sort? The conditions of participation for Medicare require hospitals to be appropriately staffed to provide emergency treatment. Now, in a situation where a hospital hasn't done that and it doesn't have anyone on hand who can provide care, you know, maybe all of the doctors called in sick that day and there's just literally no one in the emergency room, or in this case, if everyone had a conscience objection, then the hospital would not be able to provide the care. But there are conditions of participation that are meant to ensure that there is good governance of hospitals and organization to account for these situations. When you say it's a consequence of them not being able to provide the care, it would be what? In that circumstance, I think they would likely be out of compliance with the conditions of participation that require them to be appropriately staffed. But if the question is, could you force an individual doctor to step in then over a conscience objection, the answer is no, and I want to be really clear about that. We don't understand EMTALA to displace it. Excuse me. The question is whether or not they must have available someone who can comply the procedures required by EMTALA. And what would be the consequence if they didn't? Would it be eventual termination of their participation in Medicare? That's right. So if a hospital was continually disobeying the requirement to have in place sufficient personnel to run their emergency room, then I imagine that HHS would, through enforcement action, work with that hospital to try to bring it into compliance. And if the hospital ultimately is just leaving itself in a position where it can never provide care, then it would terminate the Medicare funding agreement. I thought you just said a minute ago. I'm sorry. Oh, no, go ahead. I just want to clarify this colloquy. I thought you said a minute ago, though, if the hospital had a conscience objection and therefore didn't provide certain care, that that wouldn't render it out of compliance. Which is it? That's correct. So the hospital could assert a conscience objection, and EMTALA would not override that. My question, I have a question about the Hyde Amendment. So I gather from the briefing that there might be some situations in which EMTALA would require an abortion, but the Hyde Amendment wouldn't permit federal funds to be used to pay for it. And you said in your brief that EMTALA requires, in other circumstances as well, stabilizing treatment to be given that federal funds don't cover. Can you give an example of that? And am I right about the Hyde Amendment? And then can you give an example of that? Yes. So you are right about both things. It is common under EMTALA that hospitals are going to have to provide care where there's not federal funding available. And I'll give you an example of a Medicare patient who goes in and his emergency medical condition means he needs a particular drug that's not covered by Medicare benefits. Still, the hospital has to provide him with stabilizing treatment and give him that medication, even though the federal funding isn't going to pay for it. And that also applies to people who are uninsured, who aren't covered by Medicare in the first instance. The whole point of EMTALA was it doesn't matter your circumstances. It doesn't matter whether you can pay or not. It doesn't matter the particulars of your situation. This is a guarantee. You can get stabilizing treatment. I want to say, though, that I don't think there's any inconsistency between the lines Congress drew in EMTALA and Hyde. And Congress itself has recognized that these statutes address discrete issues. I'm thinking here of the provision in the Affordable Care Act that was exclusively about abortion. And there Congress said nothing in the ACA displaces Hyde and the other federal funding restrictions on abortion, but also nothing in the ACA displaces EMTALA's requirement to stabilize. And that shows two things. It shows, first, that Congress recognized that stabilizing care can sometimes be pregnancy termination. And I think it also showed Congress's recognition that these statutes address their own distinct fears. And one final point on Hyde, Justice Barrett. My friend isn't drawing a line based on Hyde either, because his point is even if a woman is on the brink of death and she goes to an emergency room and there are federal funds available under Hyde to treat her, still hospitals have no obligation under EMTALA to provide that care. So what about the call I was having with your friend about what stabilizing treatment entails? Let's imagine a situation in which a woman is, I don't know, 10 weeks, and is told that if you carry this pregnancy to term it could have consequences for your health, but you just would need to abort before, say, 15 weeks, something like that. So there's not an immediacy. So she's stable when she leaves the hospital, but in Idaho there's no place else that she can go, at least until she's 15 weeks. What is the federal government's position then? I think, if I'm understanding the hypothetical correctly, that she likely wouldn't have an emergency medical condition in the first place, because the definition of having an emergency medical condition is that without immediate treatment you will reasonably be expected to have serious dysfunction of your organs or serious impairment of your bodily functions. And so in that situation where a woman is somewhat high risk, maybe she has certain complications where doctors can say there's some danger with continuing this pregnancy, I don't think that that creates the kind of emergency medical condition that EMTALA is aimed at. Okay, last question, and this is about the spending clause issue. So it does seem odd, and I think kind of what some of the questions are getting at, but it does seem odd that through a side agreement between a private entity and the federal government the private entity can get out of state law, right? So in another administration, would it be possible then in reliance on the spending power for Congress to say, you know, any hospital that takes these funds cannot perform abortions, or any hospital, despite state law requiring a state constitutional amendment, requiring abortion to be available. Is that possible, or, you know, with gender reassignment surgery? I mean, you can imagine it kind of going back and forth through spending clause litigation in ways that would be unusual. Yes, I think Congress has broad power under the spending clause to attach conditions. Now, it doesn't mean that it's wholly unlimited. Obviously, Congress would be having to act pursuant to an enumerated power. It would have to comply with other constitutional limits, and so the law would have to be valid. The spending clause itself has built-in limits, things like relatedness. So it would have to be acting pursuant to an enumerated power and forbidding gender reassignment surgery or abortion or those sorts of things? Oh, no, I just meant that it would have to be valid. The spending clause itself would be enough, yes. So we think the spending clause itself would be enough. So just to follow up on that and going back to where I started with the could the federal government essentially regulate the practice of medicine in the states through the spending clause? The answer, I think, is yes, Congress could prohibit gender reassignment surgeries across the nation. It could ban abortion across the nation through the use of its spending clause authority, right? Congress does have broad authority under the spending clause. And, yes, if it satisfies the conditions that the spending clause itself requires, then I think that that would be valid legislation. And the Court has in many contexts recognized the spending clause legislation preempts. So the answer is yes. Okay. So how do we reconcile that with the statement in 1395 that nothing in this subchapter allows a federal officer to exercise any control over the practice of medicine? So at the outset, I think if Congress itself is doing it, then that provision is inapplicable by its own terms. That's looking at the – I don't think it informs our view and understanding of the statute in any way. Well, I think in the event of some kind of direct conflict, you know, looking at Entala in particular, it's the later in time enacted statute, and it's clearly more specific. So it would control. But this Court itself has rejected the idea that there would be that kind of conflict. And I'm thinking of the CMS vaccine case where the litigants relied on this exact same provision of the Medicare Act, Section 1395. And this Court said, no, that can't bear the weight that those litigants would place on it or it would call into question all of the conditions of participation in Medicare. Do you agree that our clear statement rule with respect to spending clause legislation, our clear statement rule with respect to federalism are in play here? I think that here Congress has spoken clearly with respect to what providers are supposed to do. That's not the question. Do you think those presumptions apply? Forget about whether you can satisfy them. The requirement of clear notice under spending clause legislation, yes, I think that that does apply, and providers have always understood their obligations under Entala. General, let me ask you to respond to a couple of things Petitioner's Counsel said and just give you the opportunity to respond. He suggested or said that you haven't identified a circumstance in which something that Entala requires Idaho wouldn't allow. And I didn't get a chance to ask him, but I took him to sort of mean that the way that Idaho statute operates, it basically allows for a doctor to say, well, in my view, you know, this health-threatening circumstance could eventually lead to death, and so I'm going to do it. So to the extent that doctors are still able to do that, I guess he's saying there's no preemption. But is it true that there really isn't in operation a difference between the Entala and what Idaho has required here? No, that is gravely mistaken on three levels. It's inconsistent with the actual text of the Idaho law, it's inconsistent with medical reality, and it's inconsistent with what's happening on the ground. And this is a really important point, so let me try to unpack this. On the text itself, Idaho's law only allows termination if it's necessary to prevent death, and that is textually very narrow compared to what Entala requires, with the category of harm to begin with. In Idaho, doctors have to shut their eyes to everything except death, whereas under Entala, you're supposed to be thinking about things like, is she about to lose her fertility? Is her uterus going to become incredibly scarred because of the bleeding? Is she about to undergo the possibility of kidney failure? So I think that that is one critical distinction. The other critical textual distinction is the idea of necessity. Under Idaho law, you have to conclude that death will necessarily result, which is also materially different, and the Idaho Supreme Court specifically recognized it. Second, with respect to the actual medical reality here, there are numerous conditions that we are worried about where a doctor's immediate concern is not death. That's a far more remote possibility. They're thinking about the health circumstances that Entala guards against. And let me give you two examples. The first is PPROM, premature rupture of the membranes. We have declarations at 594 that explain this in detail, and also at JA 615 to 617. What the doctors explain there, this is Dr. Fleischer and Dr. Cooper, is a woman comes in with PPROM. Her sac is ruptured. There's no chance the fetus is going to be able to survive. But at that point, she doesn't have active signs of infection. And so until she deteriorates, you can't think she's close to death. What you're worried about is she will become infected. She might develop sepsis. She might have these dramatic consequences for her future. But it's not about death. So I think that is one example where you can't do it. And then finally, just the actual practice on the ground. Women in Idaho today are not getting treatment. They are getting airlifted out of the state to Salt Lake City and to neighboring states where there are health exceptions in their laws because the doctors are facing mandatory minimum, two years in prison, loss of their license, criminal prosecution. The doctors can't provide the care because until they can conclude that a prosecutor looking over their shoulder won't second-guess that maybe it wasn't really necessary to prevent death. Thank you, Counsel. Justice Thomas? Justice Alito? We've now heard, let's see, an hour and a half of argument on this case. And one potentially very important phrase in EMTALA has hardly been mentioned. Maybe it hasn't even been mentioned at all. And that is EMTALA's reference to the woman's quote, unquote, unborn child. Isn't that an odd phrase to put in a statute that imposes a mandate to perform abortions? Have you ever seen an abortion statute that uses the phrase unborn child? It's not an odd phrase when you look at what Congress was doing in 1989. There were well-publicized cases where women were experiencing conditions, their own health and life were not in danger, but the fetus was in grave distress and hospitals weren't treating them. Have you seen abortion statutes that use the phrase unborn child? Doesn't that tell us something? It tells us that Congress wanted to expand the protection for pregnant women so that they could get the same duties to screen and stabilize when they have a condition that's threatening the health and well-being of the unborn child. But what it doesn't suggest is that Congress simultaneously displaced the independent pre-existing obligation to treat a woman who herself is facing grave life and health consequences. Well, let's walk through the provisions of the statute that are relevant to this issue regarding the status and the potential interests of an unborn child. Under B-1, if a woman goes to a hospital with an emergency medical condition, that's the phrase, the hospital must either stabilize the condition or under some circumstances transfer the woman to another facility. So we have this phrase emergency medical condition in that provision and then under E-1 the term emergency medical condition is defined to include a condition that places the health of the woman's unborn child in serious jeopardy. So in that situation, the hospital must stabilize the threat to the unborn child and it seems that the plain meaning is that the hospital must try to eliminate any immediate threat to the child. But performing an abortion is antithetical to that duty. You go so far as to say that the statute is clear in your favor. I don't know how you can say that in light of those provisions that I've just read to you. The statute did nothing to displace the woman herself as an individual with an emergency medical condition when her life is in danger, when her health is in danger. That stabilization obligation equally runs to her and makes clear that the hospital has to give her necessary stabilizing treatment. And in many of the cases you're thinking about, there is no possible way to stabilize the unborn child because the fetus is sufficiently before viability that it's inevitable that the pregnancy is going to be lost. But Idaho would deny women treatment in that circumstance even though it's senseless. Doesn't what I've read to you show that the statute imposes on the hospital a duty to the woman, certainly, and also a duty to the child. And it doesn't tell the hospital how it is to adjudicate conflicts between those interests. And it leads back to state law. Now maybe most of your argument today has been dedicated to the proposition that the Idaho law is a bad law, and that may well be the case. But what you're asking us to do is to construe this statute that was enacted back during the Reagan administration and signed by President Reagan to mean that there's an obligation under certain circumstances to perform an abortion even if doing that is a violation of state law. If Congress had wanted to displace protections for pregnant women who are in danger of losing their own lives or their health, then it could have redefined the statute so that the fetus itself is an individual with an emergency medical condition. But that's not how Congress structured this. Instead, it put the protection in to expand protection for the pregnant woman. The duties still run to her. And in a situation where her own life and health is gravely endangered, then in that situation, and Paula is clear, it says the hospital has to offer her stabilizing treatment. And she doesn't have to accept it. These are tragic circumstances, and many women want to do whatever they can to save that pregnancy. But the statute protects her and gives her that choice. The only way you try to get out of the statutory interpretation that I just posited is by focusing on the term individual. And you say, aha, in the Dictionary Act, individual is defined to exclude an unborn child or a fetus. That's the only way you can try to get out of what I've just outlined. And isn't it true that under the Dictionary Act definitions apply only if they are not inconsistent with the statutory text? And when you have a text that certainly you wouldn't dispute the fact that the hospital has a duty to the unborn child where the woman wants to have the pregnancy go to term, it indisputably protects the interests of the unborn child. So it's inconsistent with the definition in the Dictionary Act. No, not at all. The duty runs to the individual with the emergency medical condition. The statute makes clear that's the pregnant woman, and of course Congress wanted to be able to protect her in situations where she's suffering some kind of emergency and her own health isn't at risk, but the fetus might die. That includes common things like a prolapse of the umbilical cord into the cervix where the fetus is in grave distress, but the woman is not at all affected. Hospitals otherwise wouldn't have an obligation to treat her, and Congress wanted to fix that. But to suggest that in doing so, Congress suggested that the woman herself isn't an individual, that she doesn't deserve stabilization, I think that that is an erroneous reading of the statute. Nobody's suggesting that a woman is not an individual and she doesn't deserve stabilization. I think the premise of the question would be that the state of Idaho can declare that she cannot get the stabilizing treatment even if she's about to die. That is their theory of this case and this statute, and it's wrong. Justice Sotomayor? General, this lack of conflict, which your opposing colleague says doesn't exist, you mentioned a situation where it does. Why don't you succinctly state what they admit there's daylight. Tell us exactly how you define where the daylight exists. The daylight, as I see it, exists on two dimensions. They think that doctors can only provide stabilizing care when the woman is facing death. And we think, no, you can take into account things like kidney failure, the risk of a seizure, and lifelong neurological impacts based on that. They said the recent decision of the Oregon court says you don't need death to be imminent or immediate, I think is the word they used. So what the Idaho Supreme Court said in that decision is that there's no particular level of imminency and no certain percent chance requirement, but what the court couldn't do is turn away from the language requiring the type of harm to exclusively be death and also the inherent concept of necessity requiring some degree of imminence. It's true that it's a subjective standard under Idaho law, and the court made that clear, but what the Idaho Supreme Court also said is prosecutors are free to come in and have other medical experts second-guess doctors' decisions by saying maybe you didn't subjectively think she really needed it as necessary to prevent death because, look, her sac had ruptured, but she wasn't yet infected. And that's exactly the kind of situation that leads to women being driven out of state, dumped on neighboring states by Idaho, and criminalizing the care, the essential care that they need. Thank you. Justice Kagan? Yeah, if you could just talk a little bit about that, because as I understood it, for example, I read recently that the hospital that has the greatest emergency room services in Idaho has just in the few months that this has been in place had to airlift six pregnant women to neighboring states, whereas in the prior year they did one the entire year. So if Mr. Turner is right about what the state is trying to convey to hospitals about when they'll be prosecuted, why is this happening? I think that the reason this is happening is because those doctors can look at the text of the statute itself, they can look at the Idaho Supreme Court's decision, which made clear, very clear, that this was a departure from prior Idaho laws that tracked EMTALA, and they can recognize that their livelihood is on the line, their medical license, their ability to practice medicine, their freedom if they have to go to jail and serve one of these minimum two-year sentences of imprisonment, and they simply cannot provide the care, even consistent with their subjective medical judgment, because as a matter of medical reality, for many of these conditions, it's not yet putting a woman at the brink of death or necessary to prevent her death, yet they know that the standard of care is to provide her with termination because she is just going to get worse and worse and worse if they wait it out. And the other important point about this, and I think it goes back to this dual stabilization idea, is that tragically in many of these cases the pregnancy is lost. There's not going to be any way to save that fetus, because a woman who has PPROM at 17 weeks, there is no medical way to sustain the pregnancy to give the fetus a chance. So in that situation, what Idaho is doing is waiting for women to wait and deteriorate and suffer the lifelong health consequences with no possible upside for the fetus. It just stacks tragedy upon tragedy. And it can't be the appropriate answer. It's become transfer is the appropriate standard of care in Idaho, but it can't be the right standard of care to force somebody onto a helicopter. And it's entirely inconsistent with what Congress was trying to do in the statute. You know, one of the primary motivators here was to prevent patient dumping. The idea was we don't want people to have to go somewhere else to get their care. You go to the first emergency room in your state, and they have to treat you and stabilize you. But this effectively allows states to take any particular treatment they don't want their hospitals to provide and dump those patients out of state. And you can imagine what would happen if every state started to take this approach. A question on the spending clause, questions that you've been asked. I mean, what would, if you accepted some of these theories, what would the consequences of something like that be that we would have to worry about? I think that it would call into question any number of federal spending statutes that provide funds to private parties, and there are a bunch of them. You know, there's the Medicare system itself, which is, of course, a major federal spending program. There are funds provided under Title VI, under Title IX, a lot of federal statutes out there that give funds to private parties and insist on conditions of compliance with the federal funding restrictions. And if the court were to suddenly say that can't preempt contrary state law, then I think that it would seriously interfere with the ability of the federal government to get its benefit of the bargain in this spending program. And you mentioned before that this question has never been a part of this case. That's right. They did not make these arguments in the lower court. They briefly referred to the spending clause, but I don't understand them to have pressed this argument specifically. And so I think that the lower courts did not address it. I think the district court said in a footnote they briefly referred to it in a footnote of their brief, and it's essentially waived. Thank you. Justice Kavanaugh? You've touched on what's happening on the ground, and that's an important consideration and answer to the question of what's happening. But Idaho is representing, and I just want to get your answer on this, that, as I counted, nine conditions that have been identified by the government where MTALA would require that an abortion be available. An abortion is available under Idaho law, and that's in the reply brief. Now, are there other conditions? You've ruled out mental health. Are there other conditions you would identify, or are you just saying that that's not really happening on the ground? I think that's part of your answer. But I just want to get a fuller answer on that. It certainly isn't happening on the ground. These are the conditions that we're worried about, and I think the problem with my friend's theory that Idaho law would permit it is that you just can't square it with the text of the statute. What is there? Keep going. Well, I just wanted to say they're not the ultimate authority on what the Idaho law means. That's the Idaho Supreme Court, of course, and it has addressed this issue in the Planned Parenthood case, and I think it's really significant that in Planned Parenthood, the Idaho Supreme Court expressly contrasted this statute with other statutes that contain health-preserving measures and recognized this was a total departure from that. The legislature wanted to focus exclusively and more narrowly on a necessary-to-prevent-death exception. So I think that that essentially means that the Supreme Court of Idaho has already touched on this issue, and it's no wonder then that doctors who are facing these kinds of pregnancy complications where in their medical judgment it's not necessary to prevent death yet, but the woman is going to suffer serious health consequences, their hands are tied and they can't provide that care under the Idaho law. If what's on page 8 and 9 of the reply brief were Idaho law, would there be a problem still? So if we had an authoritative Idaho Supreme Court decision that said Idaho law allows for termination in the circumstances where EMTALA would require it, yes, of course, then the conflict goes away. But I can't imagine the court would say that because, of course, here... That's not quite what 8 and 9 say, but I take your point on that. Separate question, different category. I think one of the themes on the other side is that this law passed in 1986 was a very important law addressing a very important problem, namely the problem where hospitals were turning away poor and uninsured patients who came in for emergency care, and the idea was that can't happen. We can't allow hospitals in this country to turn away poor and uninsured people in emergencies. But their theme is that the law was not designed contextually to deal with abortion or other specific kinds of care. And so they make a textual argument, but I think they also make a broader contextual argument about the whole idea of what was going on in 1986. I want to make sure... I don't think that's really come up too much. We'll make sure you respond to that. I appreciate having the chance to address that. So at the outset, I don't think they can square that theory with the text of the statute, which says in no uncertain terms, here is the fundamental guarantee. If you have an emergency medical condition and you go to an ER in this country, they have to stabilize you. They have to give you such treatment as may be necessary within reasonable medical probability to ensure that you don't deteriorate. And yes, Congress did not provide a reticulated list of all possible emergency medical conditions and all possible treatments, but it was very clear that Congress set a baseline national standard of care to ensure that no matter where you live in this country, you can't be declined service and the urgent needs of your medical condition addressed. And it would be no different if the state had come out and decided to ban epinephrine. That's the singular way to treat anaphylaxis, a severe allergic reaction. That would violate the statute, and we would be up here making exactly the same arguments because Congress didn't want that. If you have anaphylaxis and you go to an ER anywhere around this country, they're going to give you epinephrine, and Congress mandated that. And I don't see any way to try to draw lines around to exclude pregnancy complications. In the very narrow but tragic circumstances, where the only way to address the woman's condition and prevent material deterioration is for the pregnancy to end. Thank you. Justice Barrett? So, General, I understand the primary difference between EMTALA and the Idaho statute to be this health, that Idaho focuses on the risk of life, but the federal government says that EMTALA, well, EMTALA says that the health, am I right, is health and life? That's the principal difference, but I think it's also the difference between necessary to prevent death versus the health concerns would be reasonably expected to occur. So I think that that is a standard that builds in a little more space for doctors to take action. Got it. Is the federal government aware of any state other than Idaho that has a law that does not take health into account? There are six other states that have severe abortion restrictions without a health exception. So I think that those are the primary category of states we're concerned about here. I should make clear that there are some pending judicial challenges in those states, and so their laws are not always enforceable or in effect right now. Besides Texas, has the federal government brought suits similar to the one brought in Idaho and Texas and any of these other states? To be clear, Texas is not our affirmative litigation. They sued us, but we have not brought affirmative litigation in other states, and I think this case has been on a course, and Idaho's law was particularly severe because at the point at which we sued, it seemed to cover ectopic pregnancy, and the state conceded that. Now, they have modified the law to exclude that, but it was one of the most pressing concerns because of that. Thank you. Justice Jackson? General, petitioner relies pretty heavily on clear statement rule principles, and I wonder whether you might comment on my thought that those principles actually cut against them in this case. As you said, Congress set a baseline national standard of care. It has said in no uncertain terms that the hospital must provide stabilizing care to people experiencing emergency medical conditions. There was no, as you said, you know, particular conditions or particular treatments talked about, carved out, et cetera. So if a clear statement is required, wouldn't it be the requirement of exempting abortion? I mean, you know, Justice Alito has talked about some of the references to unborn child, but none of them read like an exemption that I would think a clear statement rule would require in a circumstance in which the baseline is this clear national standard of care. Yes, I agree. I think that Congress clearly was requiring stabilization and made that an unqualified mandate. It wasn't exempting particular conditions or particular type of treatments. And, you know, this court has said that there's no cannon of donut holes. That was in Bostock, that when you have a provision like that, the fact that you don't have a specific enumeration of one of its applications doesn't mean that you should read in some kind of implicit exception. And if we're looking for something clear, we would need to see, I would think, the clear statement that Congress meant for you not to have to provide an abortion pursuant to the mandate of providing stabilizing care. Yes, and I think it's important to recognize that every relevant actor has understood the statute this way from the beginning. They understood Congress's clear mandate here. This has been the agency's position all along. We are not adopting a new position. That's reflected in our enforcement activity and in HHS's guidance and rulemakings in this area. Providers have understood it, even those hospitals that don't provide elective abortions. They have always provided life-sustaining and health-sustaining pregnancy termination consistent with EMTALA. Congress itself recognized it in the Affordable Care Act, and I don't think there's any reasonable argument to be made that people misunderstood what Congress was doing in the statute. Thank you. Thank you, Counsel. Rebuttal, Mr. Turner. Thank you, Your Honors. EMTALA takes state law practice of medicine standards as it finds them. As Justice Gorsuch noted, that's what Section 1395 says. And, in fact, in the vaccine mandate case that was referenced, that's what the Solicitor General's Office told this court when it said that 1395 does not require, does not allow federal officials to dictate particular treatments for particular cases. That's exactly what they are trying to do here with EMTALA. It's also confirmed by Subdivision F. That codifies a presumption against preemption. And so to Justice Jackson's colloquy at the end, that is the point. You do presume that state law continues to operate alongside EMTALA. You don't presume the opposite. It's supported by the CMS Operations Manual, which is HHS's Rosetta Stone of EMTALA enforcement. It tells doctors, it tells CMS enforcement agents on the ground that you consider what is available by referencing what is within the scope of that doctor's license. That is exactly what we are saying. It is also specifically directed in 42 CFR 489.11, which requires hospitals to assure that their medical staff comply with state law. That's a federal regulation that directs hospitals to require their hospital staff to comply with state law. It's also confirmed by the 115,000 enforcement instances that totally lack any theory that would support, any case history that would support the administration's reading. She says that this has always been understood to be the case. Well, you'd think that we would find in those 115,000 instances a single example where state law was overridden by EMTALA, and there isn't one. And finally, the text. The text qualifies EMTALA's stabilization requirement by the staff that is available. We know nurses can't perform open-heart surgery, and we know janitors can't draw blood. It's not just a plain mandate devoid of reference to state law. And we know the word available, even in a common usage, incorporates state law. For example, you heard just the other day that when considering whether a bed is available for homeless people, it has both a physical sense and a legal sense. And whether cigarettes or alcohol are available to people in Idaho, there is both a physical question and a legal question. Opioids are available in hospitals. They are on the shelf. They are physically there. But there is a legal question that comes into play, too. It is the same with abortions. In response to the Chief Justice's question on conscience, General Prelogger said that both hospitals and doctors are exempt from EMTALA's supposed abortion mandate. We're relieved to hear that. But I think that it highlights the utter inconsistency of the administration's reading. So if EMTALA's stabilization requirement is general enough not to override extra-textual protections, like conscience protections, then it cannot be so specific and include a requirement that is in direct conflict with state law. Those two don't jive. This Court does not lightly find a direct conflict. Congress must speak clearly. It has not done so here. The administration's position ultimately is untethered from any limiting principle. I think we heard that. There's just no way to limit this to abortion. And there's no way to limit it to Idaho. There are 22 states with abortion laws on the books. This isn't going to end with Idaho. It's not going to end with the six states that General Prelogger mentioned, because all of the states that have abortion regulations define the health and the emergency exception narrower than EMTALA does. So this question is going to come up in state after state after state. It's also not limited to physical health. I know General Prelogger says that there's no circumstance in which a mental health condition would require stabilization with an abortion. But now she's just fighting with the American Psychiatric Association. The very standards that she's setting up to say controls the EMTALA inquiry. That's not consistent. And it isn't limited to EMTALA. Justice Thomas, Alito, Justice Gorsuch, you all pointed out the major spending clause implications that are at play here. And I disagree that we didn't brief this. It's in pages 20 to 21 of our opening brief. We recognize that this is hugely concerning if the federal government can pay private actors to violate state laws, and not just any state laws, state criminal laws. The implications of that are vast. It leaves the federal government unbound by enumerated powers. And I think General Prelogger admitted that. The court doesn't have to answer that question on our reading. It does on theirs. Thank you, counsel. The case is submitted.